UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA,                                                Plaintiff,

v.                                        Criminal Action No. 3:18-cr-09-DJH

SHANNON L. ANSON,                                              Defendant.

\* \* \* \* \*

## **MEMORANDUM OPINION AND ORDER**

Defendant Shannon L. Anson is charged with bribery in connection with programs receiving federal funds. (Docket No. 1, PageID # 9-10) Anson, as an employee of the Kentucky Department of Juvenile Justice (DJJ), allegedly accepted more than $50,000 from Defendants Clifford Frank Wilkinson and Erica Beth Bowen in exchange for favorable treatment of their "equine employment training center," Bluegrass Training and Therapy Center, Inc., which had contracts with DJJ. (*Id.*, PageID # 3; *see id.*, PageID # 9-10) Anson has moved to suppress a statement she gave to agents from the Department of Justice Office of Inspector General, arguing that she was coerced into making the statement. (D.N. 40) Because the United States has demonstrated by a preponderance of the evidence that Anson's statement was voluntary, the Court will deny her motion to suppress.

**I.**

Anson was interviewed by Special Agents Alicia Vazquez and Patrick Schumacher of the Department of Justice Office of Inspector General on May 11, 2016. (D.N. 40-3, PageID # 142-44) Before the interview, Anson was presented with an OIG form labeled "WARNINGS AND ASSURANCES TO EMPLOYEE REQUESTED TO PROVIDE INFORMATION ON A VOLUNTARY BASIS." (D.N. 40-2) The agents reviewed the form with Anson, who

1

acknowledged at the outset of the interview that she understood the interview was voluntary. (D.N. 40-3, PageID # 144-45) The form describes the investigation as "pertain[ing] to[] allegations relating to improprieties with DOJ [g]rants related to the Bluegrass Training & Therapy Center (BTTC)." (D.N. 40-2) The form further provides:

> This is a voluntary interview. Accordingly, you do not have to answer questions. No disciplinary action will be taken against you if you choose not to answer questions.
>
> Any statement you furnish may be used as evidence in any future criminal proceedings or agency disciplinary proceeding, or both.

(*Id.*) Anson's signature appears under the "Waiver" section of the form, which states: "I understand the warnings and assurances stated above and I am willing to make a statement and answer questions. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me." (*Id.*)

The interview began with background questions concerning Anson's employment at DJJ. (D.N. 40-3, PageID # 146-49) Schumacher then asked Anson about the extent of her relationship with Wilkinson and Bowen and her connection to BTTC. (*Id.*, PageID # 149-51) When asked whether she had ever had employment outside DJJ, Anson stated that she had done "case management" with an entity called Family Links. (*Id.*, PageID # 151-55) The questioning then returned to BTTC:

> MR. SCHUMACHER: Have you ever received any money from BTTC?
>
> MS. ANSON: No.
>
> MR. SCHUMACHER: I would like to remind you what we stated before we got going here that if there's any information that you know is not truthful, this would be a good time not to be covering over it.
>
> One of the things that we've already done is issued a number of subpoenas to their bank and you have a bank account with PNC, correct?
>
> MS. ANSON: Yes.

MR. SCHUMACHER: So can you explain why there's a number of checks from BTTC in the amount of $1,000 beginning in 2013 going through 2015 issued out in your name?

MS. ANSON: (No audible response.)

MR. SCHUMACHER: Would you like me to re-ask the question?

MS. ANSON: No.

MR. SCHUMACHER: Have you received any money from BTTC, or from Erica Bowen or Jay Wilkinson directly?

MS. ANSON: Well, that's not what, I guess I, *I guess* we're done here because—

MR. SCHUMACHER: Okay. Is there any other questions [sic] that I could ask you that you would want to answer?

MS. ANSON: I, *I don't know* because I'm thrown off by what—

MR. SCHUMACHER: Do you understand that there's some obvious issues here for one of the things that your job duties involved was making referrals.

MS. ANSON: Um-hmm.

MR. SCHUMACHER: We see some funds being paid out from BTTC to you. We don't see any outside employment authorization form for you to be working at BTTC, so there's [a] question of why are they paying you money. This was one of the reasons why we were here to talk to you to see if you want to go on record. Now, again, *you don't have to answer any questions. If you say we're done, we're done.*

MS. ANSON: *Right.*

MR. SCHUMACHER: And we'll turn the recorder off in a second. Before I do, I just want to make sure that you understand that this was one of the opportunities. All of the information that this case is finding is going to get presented to the United States Attorney's Office and they are going to be making some decisions on this one.

MS. ANSON: Um-hmm.

MR. SCHUMACHER: You understand that at the very least this looks pretty untoward.

MS. ANSON: Um-hmm.

MR. SCHUMACHER: Even if there is absolutely nothing wrong with it, and I'm not drawing that conclusion myself, but the United States Attorney's Office is

going to be drawing that conclusion. And if we go to him and say well, we sat down and interviewed her and we got to that point and she said we were done, they're going to kind of read into that.

So, again, *if we're done, we're done, is there anything else that I need to ask you about before I turn the recorder [off], or anything else that you want to say before I end the recording*?

MS. ANSON: *Well, just that, yeah*, that's not, I mean actually I'm really thrown off—

MS. VAZQUEZ: It is your chance to explain if you have anything to add, because we're also going to be interviewing other people today, including Ms. Bowen and Mr. Wilkinson.

MR. SCHUMACHER: And some of the other issues involve them essentially double billing for some of the youth, having youth that weren't on-site, grant money received claiming the youth were there when the youth say they were not on-site at all. Some of these were on timesheets that as part of your duties you signed off and certified as being accurate. So do you think they're going—

(D.N. 40-3, PageID # 155-59 (emphasis added)) From this point forward, Anson engaged with the agents, responding to questions and stating that she "want[ed] to see" a document Schumacher mentioned, even after he reminded her that she could end the interview.[1] (*Id.*, PageID # 160) The interview continued for several more minutes, with no further indication by Anson that she wished it to stop. (*See id.*, PageID # 159-70; D.N. 42-1)

Anson now argues that her statement was coerced and therefore involuntary. She asserts that she was never told of the possibility of a criminal investigation and that the OIG agents gave her "bad legal advice" when they said that the U.S. Attorney's Office would "read into" her refusal to discuss any money she had received from BTTC. (D.N. 40, PageID # 137) The

---

[1] MR. SCHUMACHER: All right. *You indicated before that we're done here. So we've kind of continued for a minute. Do you want to stop?*
MS. ANSON: I, I—
MR. SCHUMACHER: Because there is a document that has your signature on it that I would kind of like to show you that attaches to that v[e]in, but again, *if you say we're done, we're done*.
MS. ANSON: *Yeah, I want to see that*.
(D.N. 40-3, PageID # 160 (emphasis added))

4

United States maintains that there is no evidence of coercion. (D.N. 42) No party has requested a hearing on the motion. (*See id.*, PageID # 177 n.1) The Court has reviewed the transcript and audio recording of Anson's interview (D.N. 40-3; D.N. 42-1) and agrees that no hearing is necessary.

## II.

When a defendant claims that her statement to investigators was coerced, the United States must prove otherwise by a preponderance of the evidence. *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999) (citing *United States v. Wrice*, 954 F.2d 406, 410 (6th Cir. 1992)). The Sixth Circuit

> has established three requirements for a finding that a [statement] was involuntary due to police coercion: (i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement.

*Id.* (citing *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988)); *see also United States v. Binford*, 818 F.3d 261, 271 (6th Cir. 2016) (quoting *Mahan*, 190 F.3d at 422). The overarching question is whether, under the totality of the circumstances, "[the] defendant's will was overborne." *Mahan*, 190 F.3d at 422 (quoting *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994)). For purposes of this inquiry, "[r]elevant factors may include the defendant's age, education[,] and intelligence; whether the defendant has been informed of [her] constitutional rights; the length and extent of the questioning; and the use of physical punishment, such as the deprivation of food or sleep." *Id.* at 422-23 (citing *Ledbetter*, 35 F.3d at 1067); *see United States v. Montgomery*, 491 F. App'x 683, 688 (6th Cir. 2011) (finding no coercion where there was "nothing in the discussion between [officer and defendant] rising to the level of an irresistible inducement that would render the confession involuntary" and "[n]othing in the record

indicate[d] that [defendant] was especially sensitive to pressure, that he had been physically abused, or that his emotional or psychological equilibrium had been upset by his treatment at the hands of officials" (second alteration in original) (quoting *Wrice*, 954 F.2d at 411)).

In *Mahan*, the Sixth Circuit rejected the defendant's contention that he had been coerced into speaking to investigators, finding that "the totality of the circumstances surrounding Mahan's interview f[e]ll far short of the police coercion required to render a defendant's statement involuntary" given that

> (i) Mahan was never placed under or threatened with arrest; (ii) [the interviewing FBI agent] never brandished a handgun or handcuffs; (iii) the interview took place in an unlocked room at Mahan's workplace, and Mahan was never told that he could not leave; (iv) the interview lasted only an hour and a half, including the time required to change rooms; and (v) [the agent] made no promises to induce Mahan's cooperation, nor did he make any threats of physical violence.

*Id.* at 423.

Anson likewise was not restrained or threatened with arrest or violence; the OIG agents "made no promises to induce [her] cooperation"; and her interview was one-third the length of the interview found permissible in *Mahan*, with no food or sleep deprivation. *See id.* She does not contend that her "age, education[, or] intelligence" affected her ability to understand the possible ramifications of the interview. *Id.* Moreover, Anson acknowledges that because she was not in custody at the time of the interview, no *Miranda* warnings were required. (D.N. 40, PageID # 138; D.N. 45, PageID # 197)

Anson points to her lack of "experience[] with the criminal justice system" or knowledge "that she was part of a criminal investigation" as evidence that her statement was involuntary. (D.N. 40, PageID # 138) But as noted by the government, the Warnings and Assurances form clearly stated the possibility of criminal proceedings, and Anson "remained 'guarded and self-protective' throughout the interview" despite her inexperience. (D.N. 42, PageID # 182 (quoting

6

*United States v. Boskic*, 545 F.3d 69, 80 (1st Cir. 2008)); *see id.*, PageID # 181) *Cf. United States v. Rutherford*, 555 F.3d 190, 196 (6th Cir. 2009) ("Perhaps the defendants could argue they would have exercised greater caution if the agents questioning them had represented the investigation as criminal in nature, but notes of the conversations suggest the defendants were already guarded in their dealings with the IRS."). Anson's refusal to answer questions about payments she received from BTTC "suggest[s] [she] felt free when [she] answered those questions that [she] did." *Id.*

Nor did Anson's equivocal statement "I guess we're done here" preclude further questioning. *Cf. United States v. Miller*, 696 F. App'x 696, 702 (6th Cir. 2017) (finding defendant's "statement that he preferred not to answer any more questions" during custodial interview insufficient to warrant suppression and affirming district court's suppression of only those statements made after defendant "unequivocally end[ed] the interview"). While Schumacher did continue the interview beyond that point—first asking whether there were "any other questions that [he] could ask [Anson] that [she] would want to answer," to which she replied "I don't know"—he repeatedly reminded Anson that she had indicated she wished to stop and that he was willing to do so. (D.N. 40-3, PageID # 156; *see id.*, PageID # 157-58, 160, 166) The agents' warning that Anson risked missing an opportunity to tell her side of the story was no doubt intended to encourage Anson to speak, but "[n]ot all psychological tactics are unconstitutional." *Mahan*, 190 F.3d at 422 (quoting *Ledbetter*, 35 F.3d at 1067) (rejecting argument that "any psychological coercion, however[] slight, renders a statement involuntary" where FBI agent purportedly "coerced [defendant] into admitting his role in the crime by telling him that he could get into serious trouble for providing false information and that his story was unbelievable"); *see also United States v. Delaney*, 443 F. App'x 122, 129 (6th Cir. 2011)

(finding no coercion where agents explained to defendant that cooperation would result in favorable treatment under the sentencing guidelines and increase his chances of going home that day; "[c]ertainly, the agents made these statements with the intent to compel Delaney to testify, but they were not false"). "Coercion is not the same as persuasion." *United States v. Charlton*, 737 F. App'x 257, 261 (6th Cir. 2018). Rather, "[t]o 'coerce' means to 'compel by force or threat.'" *Id.* (quoting *Black's Law Dictionary* 315 (10th ed. 2014)).

Anson asserts that based on Schumacher's comment that the United States Attorney would "kind of read into" her silence, "[a] reasonable person in [her] position would be led to believe that [she] had no choice but to continue answering questions or receive harsher adjudication." (D.N. 45, PageID # 197-98) Yet she cites no case in which similar comments were found to be objectively coercive, and the Court is aware of none. Although "promises of leniency and threats of prosecution can be objectively coercive," *Montgomery*, 491 F. App'x at 687 (quoting *United States v. Johnson*, 351 F.3d 254, 261 (6th Cir. 2003)), Anson does not argue that the OIG agents promised her anything, and any threat of "harsh judgment by the United States Attorney's Office" was indirect and only vaguely implied. (D.N. 45, PageID # 197)

Moreover, "promises to recommend leniency or speculation that cooperation will have a positive effect do not make subsequent statements involuntary." *Montgomery*, 491 F. App'x at 687 (quoting *Delaney*, 443 F. App'x at 129). The argument that an officer's statements "were objectively coercive because they implied that [the defendant] could escape prosecution by waiving his right to remain silent" has been rejected by the Sixth Circuit.[2] *Binford*, 818 F.3d at

---

[2] In *Binford*, the defendant challenged the officer's "offer to help Binford if he cooperated," statement of "you help me, I help you," and "refusal (upon inquiry by Binford) to tell Binford whether he was going to jail." 818 F.3d at 271. The Sixth Circuit concluded that "[e]ven if [these] statements, which at most imply [the officer] could help Binford with charges if Binford

8

271 (internal quotation marks omitted); *cf. Delaney*, 443 F. App'x at 129 ("We have found that 'promises to inform a prosecutor of cooperation do not, *ipso facto*, render a confession coerced.'" (citations omitted)). In contrast, the Sixth Circuit found objectively coercive a police officer's "explicit," "legally inaccurate"—and ultimately broken—promises that the defendant would not be charged with a crime unless the officer himself typed a warrant and that if the defendant provided information regarding a gun, he would not be charged. *United States v. Siler*, 526 F. App'x 573, 576 (6th Cir. 2013).

The statements at issue here simply do not reach the level deemed objectively coercive by the Sixth Circuit. *See id.*; *Mahan*, 190 F.3d at 423 (citing cases in which statements were deemed voluntary despite officers having lied to defendant or threatened to charge defendant with crimes). The Court thus need not address the remaining factors.[3] *See Binford*, 818 F.3d at 272.

## III.

The United States has shown by a preponderance of the evidence that Anson's statement was voluntary. *See Mahan*, 190 F.3d at 422. Accordingly, and the Court being otherwise sufficiently advised, it is hereby

---

cooperated, amounted collectively to an implied promise of leniency, it was not objectively coercive." *Id.*

[3] There is no evidence to support the second and third factors—whether "the coercion in question was sufficient to overbear the defendant's will" and whether "the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement," *Mahan*, 190 F.3d at 422—in any event. Nothing in the record suggests that Anson was particularly concerned by Schumacher's comment or that it prompted her speak against her will; to the contrary, she refused to discuss the topic of payments from BTTC for the duration of the interview. *Cf. Siler*, 526 F. App'x at 576 (finding second and third *Mahan* factors satisfied where defendant "was very focused on what [investigator] was promising him regarding leniency[] and . . . exhibited serious concern about making incriminating statements concerning the gun" during interviews; "made a point of calling [investigator] back into the interrogation room during the first interview to ask for more details about leniency as it related to the gun charge"; and "repeatedly tried to get in contact with [investigator]" between interviews).

9

**ORDERED** that Anson's motion to suppress (D.N. 40) is **DENIED**.

June 17, 2019

**David J. Hale, Judge
United States District Court**